Filed 3/26/25  P. v. Castaneda CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSUE DANIEL CASTANEDA et al.,<br><br>    Defendants and Appellants. | D085179<br><br><br>(Super. Ct. Nos. FWV19004062<br>& FWV19004063) |


APPEALS from judgments of the Superior Court of San Bernardino County, Ingrid Adamson Uhler, Judge.  Affirmed as modified.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant Josue Daniel Castaneda.

David P. Lampkin, under appointment by the Court of Appeal, for Defendant and Appellant Rony A. Castaneda Ramirez.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Kristen Kinnaird Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

Josue Daniel Castaneda and Rony A. Castaneda Ramirez appeal the judgments sentencing them to prison after a jury found them guilty of second degree murder and assault with a deadly weapon. They contend the trial court prejudicially erred by instructing the jury on a factually unsupported theory of aiding and abetting and by refusing to instruct the jury on involuntary manslaughter as a lesser included offense of murder. Josue and Rony[1] also contend the court did not award them all the presentence custody credits they were due. Josue contends his abstract of judgment contains a clerical error. We modify the judgments to award the correct number of presentence custody credits, order correction of the clerical error in Josue's abstract of judgment, and affirm the judgments as modified.

## I.

## FACTUAL BACKGROUND

Josue and Rony are brothers who lived together in a residential section of Chino. Their house was on Chino Avenue near the head of a horse trail that runs along the rear of a property owned by Sandy.

On December 14, 2019, Sandy hosted a wedding reception in her backyard for her sister, Esther, and brother-in-law, Joe. The guests numbered between 250 and 300. Josue and Rony went to the party even though they were not invited and spent several hours there drinking, dancing, and conversing with guests. Police arrived at 11:45 p.m. to end the reception because of the noise. Josue and Rony lingered at the bar with Joe and Sandy's uncle, Jose, until Sandy told them to leave, and then departed through a gate that led to the horse trail.

---

[1] We follow the parties' practice of referring to appellants, victims, and witnesses by their first names instead of last names for clarity because there are common surnames among the group.

2

At approximately 2:20 a.m. on December 15, 2019, Sandy, Jose, and Joe walked to the back of the yard to lock the gate. Sandy's brother Juan followed them. As Sandy glanced at the horse trail, she saw Rony and Josue approaching. They said they returned to retrieve their cell phones. Joe asked Rony and Josue who had invited them to the wedding reception, and they answered, "George." Joe asked, "What George?" Either Josue or Rony then said to Joe, "Jump, bitch."

Joe, Sandy, Juan, and Jose all jumped over the fence onto the horse trail. A melee ensued during which Rony and Josue struck Joe with their fists and struck Juan's face and upper body with bats. Juan struggled with Josue on the ground, wrested the bat from him, and tossed it to the side. As Juan was getting up, Rony struck him in the head with a bat. Jose tried to assist Juan and was struck in the shins with a bat. Rony and Josue then ran down the horse trail toward their house.

Joe, Sandy, Juan, and Jose ran after Rony and Josue. Juan had to stop and sit down at the curb when he reached the head of the horse trail on Chino Avenue because he was dizzy. Joe continued to pursue Rony and Josue, and Jose followed Joe. Sandy got into a truck she had parked on Chino Avenue at the head of the horse trail and drove toward Joe.

Rony and Josue arrived at the house on the northeast corner of Chino Avenue and 17th Street (the corner house) and entered the side yard through a wooden gate that was painted white. Joe followed them through the gate.[2] About a minute later, Jose went through the gate, called out for Joe, received no answer, and left.

---

[2]    Jose saw Joe pass through an open gate into the side yard. Sandy saw Joe kick the gate open and then enter the side yard.

Soon thereafter, Joe's brother Isaac ran down Chino Avenue toward 17th Street and saw Josue holding a bat as he stood on the lawn of the house next to the house on the corner. Isaac asked Josue where Joe was, but Josue gave no answer. Isaac then saw Rony climb over the fence of the corner house onto the top of a car in the driveway of the adjacent house and jump off the car. Isaac asked Rony where Joe was, but Rony did not respond. Rony joined Josue and the two departed. Isaac proceeded to the house on the corner and entered the side yard through the open gate. He called out for Joe but received no response.

Police officers responded to a 911 call and found Juan lying on the ground with a head injury. Other family members asked officers to look for Joe and directed them to the corner house. When officers arrived at the corner house, they entered the side yard through the open gate. They found Joe lying dead on the concrete walkway behind the house where Rony had climbed over the fence. There were white paint markings on the vest Joe was wearing. A wooden plank that was painted white and that had been detached from the gate to the side yard lay near his feet.

At autopsy, the pathologist identified several injuries on Joe's body. Two distinct lacerations above and to the side of his left eye overlay skull fractures, which overlay hemorrhages in and on the brain. Those two injuries were caused by two distinct impacts with a hard object, either one of which would have rendered Joe unconscious and led to death within minutes. There were two abrasions on the left side of Joe's face, contusions on both sides of his nose, a laceration of his lower lip, and bleeding in his upper lip. Injuries to Joe's torso included an abrasion on the right side of his chest and contusions on the right side of his abdomen, hip, and upper back. The abrasion on the right side of the chest corresponded to the white paint

4

markings on Joe's vest.  The contusions on the upper back, abdomen, and hip were consistent with being hit by a bat.  Joe also had multiple contusions on his upper and lower limbs that indicated he had been hit at least eight times.  The pathologist concluded the cause of Joe's death was blunt force trauma to the head and the manner of death was homicide.

On the afternoon of December 15, 2019, police officers executed a search warrant at Rony and Josue's house.  Officers found the clothing Rony and Josue had worn at the wedding reception freshly washed and piled up on a chair; two cell phones, one belonging to Rony and the other to Josue; but no bat.  Josue and Rony were taken into custody.  Rony had no visible injuries.  Josue had a small cut over his left eye, abrasions and contusions on his left shoulder and right arm, and redness on his mid- to lower back, and he complained of pain in his right hand.

## II.

## PROCEDURAL BACKGROUND

The People charged Josue and Rony with the murder of Joe (Pen. Code, § 187, subd. (a); undesignated section references are to this code) and assault on Juan with a deadly weapon (§ 245, subd. (a)(1)).  They pled not guilty.  The case proceeded to a jury trial at which the parties presented witnesses and other evidence that established the facts summarized in part I, *ante*.

The prosecutor's theory on the murder charges was that Josue and Rony killed Joe with implied malice.  The prosecutor argued Josue and Rony were "working together as a team" and "ambushed" Joe in the back of the corner house.  She argued one of them, the direct perpetrator, used the bat to strike the fatal blows to Joe's head, and the other, the aider and abettor, knew the direct perpetrator was going to use the bat in that way and assisted the direct perpetrator by using the wooden plank from the gate to the side

5

yard to strike Joe. The prosecutor told the jury she did not have to prove which brother was the direct perpetrator and which the aider and abettor. Both were guilty of second degree murder, she argued, based on the types and number of injuries they inflicted on Joe and the types of weapons they used to inflict those injuries, which showed they intentionally committed acts they knew were life-threatening and did so with conscious disregard for Joe's life.

Josue and Rony argued self-defense. Their theory was that they ran to the corner house to hide from Joe and the others who were chasing them, that Joe broke the wooden plank off the gate and used it as a weapon to chase after Rony and Josue, and that they defended themselves against Joe's advances.

The trial court gave the jury several instructions related to the murder charges. It instructed the jury on implied malice murder. (CALCRIM No. 520.) The court gave an instruction on voluntary manslaughter, as a lesser included offense of murder, based on theories of heat of passion and imperfect self-defense. (CALCRIM Nos. 570, 571.) It instructed on principles of aiding and abetting as they apply to implied malice murder or voluntary manslaughter. (CALCRIM No. 401; see fn. 3, *post*.) The court gave instructions on self-defense or defense of another as negating liability for murder or manslaughter. (CALCRIM No. 505.) It refused Josue and Rony's requests to instruct the jury on involuntary manslaughter as a lesser included offense of murder. (CALCRIM No. 580.)

After deliberating for approximately 10 hours, the jury found both Josue and Rony guilty of second degree murder and assault with a deadly weapon. The trial court sentenced them each to prison for three years for the assault (§ 245, subd. (a)(1)) plus a consecutive term of 15 years to life for the

6

murder (§ 190, subd. (a)). The court awarded Josue and Rony each 1,185 days of presentence custody credits.

## III.

## DISCUSSION

Rony and Josue seek reversal of their murder convictions on two grounds. They complain the trial court prejudicially erred by: (1) instructing the jury on a "factually invalid" theory of liability for murder based on aiding and abetting; and (2) refusing to instruct the jury on involuntary manslaughter as a lesser included offense of murder. Rony and Josue also complain the trial court did not give them all the presentence custody credits to which they are entitled and ask us to modify the judgment to award the correct number of credits. Finally, Josue asks us to correct the year of the commission of the murder in his abstract of judgment. We take up these issues in turn.

### A.    *Instruction on Aiding and Abetting*

Rony and Josue argue the trial court erroneously instructed the jury on aiding and abetting as a theory of liability for implied malice murder because, they say, there was no evidence that either of them knew the other intended to commit a life-endangering act, committed an act to assist the other, and acted with conscious disregard for human life. They further argue the instructional error was prejudicial and deprived them of liberty without due process of law because there is a reasonable probability the jury found them guilty based on a factually invalid theory. These arguments lack merit.

#### 1.    *Standard of review*

Whether we consider this claim as one of instructional error in submitting the issue of aiding and abetting to the jury or as one of insufficiency of the evidence to support the jury's guilty verdicts on the

murder charges, we apply the substantial evidence standard of review to the claim. (*People v. Nelson* (2016) 1 Cal.5th 513, 550; see *People v. Thompson* (2010) 49 Cal.4th 79, 120 (*Thompson*) [rejecting claim insufficient evidence supported aiding and abetting instruction when sufficient evidence supported conviction as aider and abettor].) We review the record in the light most favorable to the verdicts to determine whether the record contains substantial evidence (i.e., evidence that is reasonable, credible, and of solid value) from which a reasonable jury could find each element of the charged offense beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 318–319; *Nelson*, at p. 550.) We presume in support of the verdicts the existence of every fact the jury reasonably could deduce from the evidence. (*Nelson*, at p. 550; *People v. Guiffreda* (2023) 87 Cal.App.5th 112, 125.) "We discard evidence that does not support the judgment as having been rejected by the trier of fact for lack of sufficient verity." (*People v. Moore* (2010) 187 Cal.App.4th 937, 940 (*Moore*).) Substantial evidence includes circumstantial evidence and the reasonable inferences that may be drawn from it, and such evidence is as sufficient as direct evidence to support a verdict. (*People v. Brown* (2014) 59 Cal.4th 86, 105–106; *People v. Moore* (1957) 48 Cal.2d 541, 547 (*Moore*); *People v. Myles* (2023) 89 Cal.App.5th 711, 739 (*Myles*).)

2.      *Liability for aiding and abetting implied malice murder*

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a)(2).) Our Supreme Court has held implied malice has physical and mental components. The physical component is satisfied if the defendant performs an act that is dangerous to human life, and the mental component is satisfied if the

8

defendant knows the act endangers the life of another and performs it with conscious disregard for life. (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.)

Liability for murder may be imposed not only on the person who actually kills the victim with implied malice (i.e., the direct perpetrator) but also on a person who, with implied malice, helps or induces the direct perpetrator to do so (i.e., an aider and abettor). (§ 31; *People v. McCoy* (2001) 25 Cal.4th 1111, 1116–1117, 1122; *People v. Langi* (2022) 73 Cal.App.5th 972, 979, 983 (*Langi*); *People v. Superior Court (Valenzuela)* (2021) 73 Cal.App.5th 485, 499 (*Valenzuela*).) Liability for "direct aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea. [Citation.] In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life." (*People v. Powell* (2021) 63 Cal.App.5th 689, 712–713, fn. omitted (*Powell*); accord, *People v. Reyes* (2023) 14 Cal.5th 981, 990–991; *Langi*, at p. 983; *Valenzuela*, at p. 501.)[3]

---

[3] For the murder charges, the trial court modified the standard instruction on aiding and abetting (CALCRIM No. 401) to make it comply with the requirement in the cited cases that the aider and abettor act with implied malice.

Where, as in this case, two defendants are charged with murder, "[i]t is settled that as long as each juror is convinced beyond a reasonable doubt that [each] defendant is guilty of murder as that offense is defined by statute, . . . the jury need not decide unanimously whether [each] defendant was guilty as the aider and abettor or as the direct perpetrator. . . . [¶] . . . [¶] Not only is there no unanimity requirement as to the theory of guilt, the individual jurors themselves need not choose among the theories, so long as each is convinced of guilt. Sometimes, as probably occurred here, the jury simply cannot decide beyond a reasonable doubt exactly who did what. There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other." (*People v. Santamaria* (1994) 8 Cal.4th 903, 918–919; accord, *People v. Smith* (2014) 60 Cal.4th 603, 618 (*Smith*).)

3.      *Sufficiency of the evidence*

The dispositive question is whether the evidence introduced at trial sufficed to support imposition of liability on Josue and Rony for aiding and abetting murder under the principles set out above. They contend the answer is "no," because "there is a dearth of evidence" on "what the events in the backyard [of the corner house] were." They argue there is no evidence either of them knew the other would hit Joe on the head with the bat, said or did anything to encourage or to assist the other to hit Joe on the head with the bat, or acted with conscious disregard for Joe's life in so encouraging or assisting the other. Since "[i]t is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case" (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129), Rony and Josue contend the trial court erred by instructing the jury on aiding and abetting. We disagree.

10

No testimony or other evidence was introduced at trial as to exactly who did what to Joe in the back of the corner house where he was found dead. "It is true that the evidence is largely circumstantial, but such evidence 'is as sufficient to convict as direct evidence.'" (*Moore, supra*, 48 Cal.2d at p. 547.) To find Rony and Josue guilty, "[t]he jury certainly had to find that someone committed murder. But the 'jury simply did not have to find' exactly who that person was." (*Smith, supra*, 60 Cal.4th at p. 619.) As long as the evidence sufficed for the jury to find that either Rony or Josue was the direct perpetrator (i.e., the one who struck the fatal blow with implied malice) and that the other one was the aider and abettor (i.e., the one who with implied malice helped his brother strike the fatal blow), the jury could find them both guilty of second degree murder without having to decide who was the direct perpetrator and who was the aider and abettor. (*Id.* at p. 618; *Langi, supra*, 73 Cal.App.5th at p. 979.)

The evidence sufficed to establish either Josue or Rony was the direct perpetrator. Witnesses saw Joe enter the side yard of the corner house after Josue and Rony had entered the yard. Soon thereafter, Josue was seen holding a bat on the lawn of an adjacent house, and Rony was seen climbing over the fence behind the corner house to join his brother. Joe was found lying dead on the concrete walkway near where Rony had climbed over the fence. At autopsy, Joe was found to have bruises on his torso that were consistent with being hit by a bat, and fatal head injuries that resulted from being hit by a hard object. From that evidence, the jury reasonably could conclude that either Rony or Josue killed Joe by striking his head with a bat.

The evidence also sufficed to establish the direct perpetrator, whether it was Josue or Rony, struck the fatal blow with implied malice. "[L]ike all other elements of a crime, implied malice may be proven by circumstantial

11

evidence." (*People v. Superior Court (Costa)* (2010) 183 Cal.App.4th 690, 697.) "Among the circumstances courts have found relevant in determining whether malice may be inferred are the victim's vulnerability, the number of assailants, the ferocity and duration of the attack, and the unusualness or unexpectedness of the victim's death." (*Valenzuela, supra*, 73 Cal.App.5th at p. 502.) Josue and Rony beat Joe with fists on the horse trail and at least one of them beat him with a bat at the corner house. The autopsy revealed Joe was hit repeatedly with the bat, thrice to the torso and twice to the head. The blows to the head were so forceful that they fractured his skull in multiple places. Joe also had many other injuries all over his body. From this evidence, the jury reasonably could infer "the manner of the assault and the circumstances under which it was made rendered the natural consequences of [the direct perpetrator's] conduct dangerous to life." (*People v. Cravens* (2012) 53 Cal.4th 500, 508 [defendant struck already beaten victim with such force that he lost consciousness, fell, and fractured his skull] (*Cravens*).) The jury also "was entitled to infer [the direct perpetrator's] subjective awareness that his conduct endangered [Joe's] life from the circumstances of the attack alone, the natural consequences of which were dangerous to human life." (*Id.* at p. 511.) Moreover, the direct perpetrator "came to the fight armed, indicating he knew it would be dangerous—so dangerous he needed a weapon to either defend himself or inflict serious injury or death." (*Valenzuela*, at p. 503.) Lastly, the jury could reasonably infer the direct perpetrator acted with conscious disregard for Joe's life from the evidence that after "having knocked [Joe] unconscious and with his head split open on the ground, he took no steps to ascertain [Joe's] condition or to secure emergency assistance." (*Cravens*, at p. 511.)

The evidence also sufficed to establish that either Josue or Rony aided and abetted the killing with implied malice. "[T]o be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of the act." (*Powell, supra*, 63 Cal.App.5th at p. 714.) "Aiding and abetting may be shown by circumstantial evidence. It is well settled that the presence at the scene of the crime and failure to prevent it, companionship and conduct before and after the offense, including flight, are relevant to determining whether a defendant aided and abetted in the commission of the crime." (*People v. Glukhoy* (2022) 77 Cal.App.5th 576, 599 (*Glukhoy*).) "Motive is another circumstance to be considered in determining aiding and abetting liability." (*Ibid.*) These circumstances were all present in this case.

As for companionship, Josue and Rony are brothers who lived together and were together before, during, and after the killing. As for conduct before the killing, the brothers returned to Sandy's house armed with bats under the pretext of retrieving their cell phones, instigated a fight during which they both beat Joe with their fists and Juan and Jose with their bats, and then fled together to the corner house with Joe in hot pursuit. As for presence at the crime scene and failure to prevent the crime, Rony and Josue ran to the corner house together, and after Joe followed them there, one of the brothers killed him by striking his head with a bat. From the paint markings on Joe's vest, the underlying contusion on his chest, and the location of the wooden plank from the gate near Joe's feet, it appears the other brother struck Joe with the plank. As for conduct after the killing, Rony climbed over the fence into the neighboring yard, where Josue stood holding the bat. As the two fled the scene together, they refused to respond to Isaac's inquiries about Joe's whereabouts. Finally, as to motive, "familial

13

concern" presented a motive for one brother to assist the other in the life-endangering attack on Joe.  (*People v. Rogers* (1985) 172 Cal.App.3d 502, 514; accord, *Glukhoy, supra*, 77 Cal.App.5th at pp. 599–600.)

From this evidence, a reasonable jury could infer that Josue and Rony: (1) returned to Sandy's house to instigate violence; (2) ran together to the corner house, where they coordinated a life-endangering attack on Joe during which one brother used the bat to knock Joe unconscious and fracture his skull while the other assisted by using the wooden plank to hit Joe in the chest; and (3) with conscious disregard for human life, left Joe on the ground for dead.  Such inferences support guilt of aiding and abetting an implied malice murder.  (See *Myles, supra*, 89 Cal.App.5th at p. 739 [substantial evidence includes circumstantial evidence and reasonable inferences from it]; *Valenzuela, supra*, 73 Cal.App.5th at pp. 502–503 [instigation of and participation in armed group attack on victim who was killed supported liability for aiding and abetting implied malice murder].)

Rony and Josue offer several reasons why, in their view, the jury could not draw those inferences.  None of the reasons requires reversal of the murder convictions.

Rony and Josue contend the aider and abettor had no way to know the direct perpetrator would strike Joe on the head with the bat.  (See *Powell, supra*, 63 Cal.App.5th at p. 713 [aider and abettor must know direct perpetrator intended to commit life-endangering act].)  They argue they ran to the corner house to hide from Joe and the others whom they fought on the horse trail, not to ambush Joe.  They also argue the direct perpetrator used the bat to inflict nonfatal blows to Joe's torso before striking the fatal blows to his head.  We are not persuaded.  Minutes before the fatal attack on Joe, Rony and Josue both used bats to strike Juan's head and upper body.  (See

14

*Glukhoy, supra*, 77 Cal.App.5th at p. 599 [conduct before crime is relevant to determining aiding and abetting liability].) Rony and Josue were outnumbered on the horse trail, but they outnumbered Joe at the corner house. (See *Valenzuela, supra*, 73 Cal.App.5th at p. 502 [number of assailants is relevant to determining mental state for aiding and abetting implied malice murder].) Although not all blows Joe suffered were fatal, the number of blows and other injuries to his body manifested the serious danger the attack posed to his life. (See *Cravens, supra*, 53 Cal.4th at p. 511 [jury may infer defendant's subjective awareness that attack endangered victim's life from circumstances of attack].) From these circumstances, the jury reasonably could infer the aider and abettor knew the director perpetrator would strike Joe's head with the bat.

Rony and Josue next contend there was no evidence either of them said or did anything to assist the other in hitting Joe's head with the bat. They argue the prosecutor's theory that the aider and abettor struck Joe with the plank from the gate is inconsistent with Sandy's testimony that Joe kicked in the gate before he entered the side yard at the corner house, and the only reasonable inference from her testimony is that Joe broke the plank off the gate and used it as a weapon. We disagree. Although Sandy testified Joe kicked in the gate to the side yard at the corner house, Jose testified the gate was open. Neither testified Joe had a plank. White paint markings on Joe's vest and a contusion on his chest were consistent with having been struck by the plank, but there was no evidence Josue or Rony had been struck by the plank. The plank was found near the fence at the spot where Rony was seen climbing over the fence after the fatal attack on Joe. On substantial evidence review, we do not reevaluate witnesses' credibility or resolve conflicts in their testimony, because such matters are exclusively for the jury. (*People v.*

15

*Brown* (2014) 59 Cal.4th 86, 106.) " 'We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 713.) From the evidence, the jury reasonably could infer either Rony or Josue used the plank to strike Joe while the other beat him with the bat.

Rony and Josue finally argue the "great variety of circumstance [that] might have preceded Joe's death" and the "dearth of evidence concerning them" make it "difficult to say there is evidence from which a reasonable jury could find beyond a reasonable doubt that [either of them] must have acted with a conscious disregard for human life." We again disagree. The autopsy showed Joe suffered a brutal beating during which he sustained many injuries all over his body, including multiple skull fractures caused by two blows to the head, one of which rendered him unconscious and the other of which killed him. The circumstantial evidence showed either Josue or Rony, with the assistance of the other, struck those blows with a bat. After the blows caused Joe to collapse on the ground, Rony and Josue fled the scene, refused to tell Isaac where Joe was, and made no effort to summon assistance for Joe. Assisting in an armed attack that severely injures the victim and abandoning him as he lay unconscious on the ground manifests a conscious disregard for human life. (*Cravens, supra*, 53 Cal.4th at p. 511; *People v. Palomar* (2020) 44 Cal.App.5th 969, 977–978.)

For the foregoing reasons, we conclude substantial evidence supported imposition of liability on Rony and Josue for aiding and abetting implied malice murder. The trial court did not err by instructing the jury on that

16

theory of liability.  (*Thompson, supra*, 49 Cal.4th at p. 120.)  "Without error, of course, there can be no prejudice."  (*People v. Mickey* (1991) 54 Cal.3d 612, 677, fn. 12.)  This claim of error therefore fails.

B.    *Refusal to Instruct on Involuntary Manslaughter*

Rony and Josue complain the court erroneously refused their requests to instruct the jury on involuntary manslaughter as a lesser included offense of murder.  They assert, "There was more than substantial evidence from which a rational properly instructed jury could have found that [they] killed accidentally, but without a conscious disregard for human life."  Josue and Rony rely on evidence that they were intoxicated,[4] that they were "greatly outnumbered," that Juan was struck with bats but not killed, and that Joe "was struck with a bat" but "no evidence that [he] was struck repeatedly." From this evidence, they argue that "[a] reasonable fully instructed jury could have concluded the intent behind the single blow to [Joe] was to incapacitate so the brothers could flee, as opposed to concluding with certainty that [they] understood or appreciated the risk to human life at the time the single blow was inflicted."  Rony and Josue further argue the instructional error requires reversal of their murder convictions because it is likely that without the error the jury would have found them guilty of involuntary manslaughter rather than murder.  We reject these arguments.

1.    *Duty to instruct on lesser included offense and standard of review*

"Generally, involuntary manslaughter is a lesser offense included within the offense of murder."  (*People v. Gutierrez* (2002) 28 Cal.4th 1083,

---

4    Josue and Rony cite nothing in the record to support their assertion they were intoxicated, and we have found nothing.  In any event, voluntary intoxication cannot negate malice, the mental state required for the jury to find them guilty of murder.  (§ 29.4; *People v. Soto* (2018) 4 Cal.5th 968, 975; *People v. Morales* (2021) 69 Cal.App.5th 978, 997.)

1145; accord, *Powell, supra*, 63 Cal.App.5th at p. 706.) " 'A trial court must instruct on all lesser included offenses supported by substantial evidence.' [Citation.] Although instruction on a lesser included offense 'is not required when the evidence supporting such an instruction is weak' [citation] or based on speculation [citation], it is required when the lesser included offense is supported by ' "evidence that a reasonable jury could find persuasive" ' [citation]." (*People v. Steskal* (2021) 11 Cal.5th 332, 345.) "[W]e construe the evidence in the light most favorable to the [accused]" (*People v. Smith* (2021) 70 Cal.App.5th 298, 308), and " ' "[d]oubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused" ' " (*Steskal*, at p. 345). "We review independently whether the trial court erred in rejecting an instruction on a lesser included offense." (*Ibid.*)

2.      *Substantiality of the evidence of involuntary manslaughter*

Involuntary manslaughter is an unlawful, unintentional killing of a human being without malice. (§ 192, subd. (b); *People v. Hendricks* (1988) 44 Cal.3d 635, 643.) The required mental state is criminal negligence, i.e., the commission of an act that a reasonable person would realize involved a high degree of risk of death or great bodily harm to another human being but that defendant did not realize involved such a risk. (*People v. Butler* (2010) 187 Cal.App.4th 998, 1007–1009; *People v. Evers* (1992) 10 Cal.App.4th 588, 596 (*Evers*).) "[T]he essential distinction between second degree murder based on implied malice and involuntary manslaughter is the subjective versus objective criteria to evaluate the defendant's state of mind—i.e.[,] if the defendant commits an act which endangers human life without realizing the risk involved, he is guilty of manslaughter, whereas if he realized the risk and acted in total disregard of the danger, he is guilty of murder based on implied malice." (*People v. Cleaves* (1991) 229 Cal.App.3d 367, 378.)

18

The question here is whether there was substantial evidence from which a reasonable jury could conclude Josue and Rony did not realize they were endangering Joe's life by beating him as they did. They correctly point out that "California courts have long recognized that not all beatings are life threatening." (*People v. Vasquez* (2018) 30 Cal.App.5th 786, 796.) In *Vasquez*, the defendant used his hands and feet to hit the victim, and "almost all of the victim's injuries—taken alone—were nonlethal. [The victim] did not suffer a fractured skull, tooth damage, intracranial bleeding, or brain bruises, which might be expected from high-impact blows to the head." (*Id.* at pp. 791, 796.) In this case by contrast, Rony and Josue first beat Joe with their fists on the horse trail, and then beat him with a bat and a wooden plank at the corner house, where they fractured his skull and caused fatal intracranial bleeding. They outnumbered Joe at the corner house and did not face the same amount of resistance they faced when they attacked Joe and Juan on the horse trail. At the corner house, Joe did not sustain a single blow with the bat, as Josue and Rony assert; Joe sustained two blows to his head and three to his torso. There were also lacerations, abrasions, and contusions all over Joe's body. After administering the brutal beating, Josue and Rony left Joe on the ground to die. They "did not simply start a fist fight in which an unlucky blow resulted in [Joe's] death. [They] savagely beat [Joe] to death. Because the evidence presented at trial did not raise a material issue as to whether [Josue and Rony] acted without malice, the trial court was not obliged . . . to instruct the jury on involuntary manslaughter . . . ." (*People v. Cook* (2006) 39 Cal.4th 566, 597 (*Cook*); see *Evers, supra*, 10 Cal.App.4th at pp. 597–598 [no instruction on involuntary manslaughter required when severity of victim's injuries indicated whoever inflicted them had to know they were life-threatening].)

19

Even had the trial court erred by refusing to instruct the jury on involuntary manslaughter, any error was harmless. "Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions." (*People v. Lewis* (2001) 25 Cal.4th 610, 646.) The court instructed the jury on voluntary manslaughter, which is a killing without malice. (§ 192, subd. (a); *People v. Schuller* (2023) 15 Cal.5th 237, 252.) By finding Rony and Josue guilty of second degree murder instead of voluntary manslaughter, the jury necessarily found they acted with implied malice. "Because the jury resolved the factual finding requisite to involuntary manslaughter against [them], [they] cannot have been prejudiced by the lack of an instruction on involuntary manslaughter . . . ." (*Cook, supra*, 39 Cal.4th at p. 597; see *People v. Rogers* (2006) 39 Cal.4th 826, 884 [when jury was instructed on lesser included offenses of second degree murder and voluntary manslaughter and found defendant guilty of first degree murder, "there [was] no reasonable probability that, had the jury been instructed on involuntary manslaughter, it would have chosen that option"]; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1145 ["the fact that the jury rejected [voluntary] manslaughter and found defendant guilty of the first degree murder . . . precludes any possible error in the refusal to instruct on involuntary manslaughter"].)

C.    *Presentence Custody Credits*

Josue and Rony contend they are entitled to an additional 32 days of presentence custody credits. The People agree, and so do we.

The trial court awarded Josue and Rony each the 1,185 days of credit recommended in the probation officer's reports. That recommendation was based on a sentencing hearing date of March 13, 2023. The hearing did not

occur until April 14, 2023, however.  Rony and Josue are entitled to credit for all days of custody from the date of arrest through the date of sentencing. (§ 2900.5, subd. (a); *People v. Dearborne* (2019) 34 Cal.App.5th 250, 267.)  We modify the judgments to award them each an additional 32 days of custody credits, for a total of 1,217 days each.  (§ 1260 [appellate court may modify judgment]; *People v. Acosta* (1996) 48 Cal.App.4th 411, 428 [modifying judgment to award additional presentence credits].

D.      *Clerical Error in Josue's Abstract of Judgment*

Josue contends his abstract of judgment lists 2018 instead of 2019 as the year the murder was committed and asks us to order the trial court to correct the error.  The People concede the error and agree we should order the requested correction.  We may order correction of a clerical error in an abstract of judgment and shall do so here.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185; *People v. Garcia* (2024) 101 Cal.App.5th 848, 858–859.)

IV.

DISPOSITION

The judgments are modified to award each appellant an additional 32 days of presentence custody credits, for a total of 1,217 days each. As so modified, the judgments are affirmed. On remand, the trial court shall prepare amended abstracts of judgment that reflect the modifications. The court shall also correct appellant Josue Daniel Castaneda's abstract of judgment to list the year of the commission of the murder as 2019. After making the modifications and correction, the court shall send certified copies of the amended abstracts of judgment to the Department of Corrections and Rehabilitation.

IRION, J.

WE CONCUR:


McCONNELL, P. J.


CASTILLO, J.

22